Thomas Mark SEMPSROTT, Petitioner,

v.

Ira M. COINER, Warden, West Virginia
Penitentiary, Respondent.

Civ. A. No. 2561.

United States District Court,
S. D. West Virginia,
Huntington Division.

Feb. 17, 1970.

John F. Wood, Jr., Jenkins, Schaub &
Fenstermaker, Huntington, W. Va., for
petitioner.

Chauncey H. Browning, Jr., Atty.
Gen. of W. Va., George E. Lantz and
Willard A. Sullivan, Asst. Attys. Gen.,
Charleston, W. Va., for respondent.

CHRISTIE, District Judge:

This proceeding comes before the
Court on a petition for a writ of habeas
corpus filed in forma pauperis by Thom-
as Mark Sempsrott, a prisoner of the
State of West Virginia, pursuant to the
provisions of 28 U.S.C.A. § 2241. The
sentence under which petitioner is con-
fined was imposed by the Common Pleas
Court of Cabell County, Huntington,
West Virginia, for a term of fifteen
years on November 17, 1967, following a
jury trial wherein a verdict of guilty of
armed robbery was returned against
him. Having exhausted his state court
remedies, petitioner seeks relief in this
court for the alleged deprivation of his

constitutional rights under the Sixth and Fourteenth Amendments, namely:

(1) That the pre-trial identification procedure employed in his case was so highly suggestive and unfair that the subsequent in-court identification by these witnesses was so tainted that it deprived him of due process of law and

(2) That the failure of his court-appointed counsel to perfect an appeal from his conviction denied him the effective assistance of counsel and caused him to be deprived of due process of law.

Counsel was appointed and an evidentiary hearing was held on August 26, 1969, to test the validity of the constitutional deprivations alleged. On the basis of the evidence as developed at that hearing, the Court is of the opinion that the writ of habeas corpus must be granted.

The facts bearing on the constitutional issues are found to be as follows: On May 26, 1967, Lola's Grocery, of Huntington, West Virginia, was robbed of some $125.00 by a man who brandished a knife and told the cashier to give him the money in the cash register or he would kill her. There were two eyewitnesses to the crime, the cashier, Mrs. Shafer, and her brother, Mr. Holley, who is the husband of the owner and was working in the store at that hour. On June 4, 1967, petitioner was arrested on a misdemeanor charge in South Point, Ohio. The authorities of that municipality informed the Huntington police that they had a suspect that seemed to fit the general description of the police flyer circulating on the Lola's Grocery hold-up man. On June 5, 1967, the Huntington police contacted Mr. Holley and arranged to take him across the Ohio River to South Point for the purpose of identifying the suspect in custody if he could do so. The police officers later testified at the evidentiary hearing in this case that they informed the witness that the suspect was to have a hearing on the evening of June 5, 1967, in the municipal court on the misdemeanor charge. Mr. Holley went into the municipal courtroom and observed the petitioner on the prisoner's bench. After this confrontation he tentatively identified petitioner as the robber, however, he said he wanted to "make sure" and he proceeded to view the petitioner on the outside of the building in the mayor's car. At this time, petitioner was in the custody of police officers, handcuffed and otherwise restrained. Following this second confrontation, Mr. Holley announced, "That is the man." Petitioner, upon hearing this accusation, broke from the car and fled. He attempted to hide under a house trailer, but the local fire department was called and with a water hose petitioner was flushed from under the trailer and placed back in custody. Mr. Holley was present throughout this course of events.

The following day, June 6, 1967, Mrs. Shafer was taken to the Ironton, Ohio, city jail by the Huntington police for the purpose of identifying the petitioner. Prior to her trip to Ironton in a police cruiser, she was told by her brother that he had seen the suspect and that he was the man. Furthermore, the police, in the course of transporting Mrs. Shafer to Ironton, told her that they had a suspect that they thought was the robber. Prior to the actual viewing of the petitioner Mrs. Shafer was shown a knife in the presence of several police officers who told her that this was the hold-up weapon.

Since his escape attempt, petitioner was in what could be described as "solitary confinement." Mrs. Shafer was taken to the top of a flight of three or four stairs and petitioner, by himself, was taken a few feet out of his cell where Mrs. Shafer observed him. Petitioner was not asked to speak and he was the only person Mrs. Shafer observed. After a few minutes he was put back into his cell. Subsequent to this confrontation, Mrs. Shafer stated that he was positively the man who robbed her. The in-court identification of petitioner by these two eyewitnesses was the only evidence against him.

Petitioner had intimated from the beginning of the proceeding against him that if he was convicted he wanted to prosecute an appeal. Following the jury's return of a guilty verdict, the petitioner's court-appointed counsel neither moved the court to set aside the verdict and award a new trial nor filed a protective notice of intent to appeal.[1] In the interim (between his conviction and his sentencing), court-appointed counsel conferred with petitioner one time—November 2, 1967. On this date, according to petitioner's counsel, petitioner received the following advice: (1) His attorney was of the opinion that there was no prejudicial error in the trial; (2) a copy of the transcript could be ordered for petitioner's use if he went on to the penitentiary;[2] (3) that he should go on to the penitentiary and start serving his time because he would not get credit for time served in jail, and (4) that if he insisted upon the prosecution of an appeal, counsel would ask the Court to relieve them of representation of petitioner. We observe that all this advice was given with counsel having only the benefit of memory, since the transcript had not yet been prepared, and was prior to the Court's passing sentence on the petitioner.

We choose to consider the alleged constitutional deprivations in reverse order.

▮▮▮ The Sixth Amendment provides that in all criminal prosecutions the accused shall have the right to the assistance of counsel. This mandate is made applicable to the states through the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). We cannot emphasize too strongly our concern with the number of state habeas corpus cases coming before us where the defendants were not adequately represented at either the trial or appeal level. The Fourth Circuit Court of Appeals shares our concern. In the recent case of Nelson v. Peyton, 415 F.2d 1154 (1969), the Court made it clearly known that the constitutional requirement that criminal defendants, whether indigent or moneyed, have effective assistance of counsel at both the trial and appeal levels would, henceforth, be more stringently applied. In *Nelson,* the rules are clear, appearing at page 1157,

" 'Appointment of counsel for an indigent is required at *every stage* of a criminal proceeding where substantial rights of a criminal accused may be affected.' Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967). (Emphasis added). Such cases as Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed.2d 1178 (1967), mark the beginning point when the right to counsel comes into being. Once the right has matured, the law is now certain that an indigent person has *filed a notice of intent to seek an appeal* or writ of error \* \* \*." (Emphasis added). Thus, it appears that petitioner's attorney was advising petitioner to pursue a course of action that he was not entitled to without filing the requisite notice of intent to appeal. Nevertheless, the state court evidently waived the statutory requirement and furnished petitioner a free transcript of his state trial. The record does not reveal whether the Court, after waiving the requirement, ever advised petitioner about the condition precedent of filing the notice.

---

1. W.Va.Code 58–5–4 provides that a notice of intent to appeal a final judgment in a criminal case must be filed within sixty days after the entry of such judgment. Under West Virginia law this notice is held to be jurisdictional and the failure to make such filing within the statutory time period precludes relief in the appellate courts of the state.

2. Provision is made by statute, W.Va. Code 51–7–7, for the issuance of a transcript of the testimony and proceedings of the trial without charge to an indigent person, however, issuance of the transcript is limited to cases "wherein

it continues through the conclusion of appellate review. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L. Ed.2d 811 (1963); Swenson v. Bosler, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 (1967). And 'where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request.' Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed.2d 70 (1962); Puckett v. North Carolina, 343 F.2d 452 (4th Cir.1965). Even if counsel appointed to conduct an appeal concludes that the appeal is frivolous and desires to withdraw, he must, nevertheless, brief anything in the record which might arguably support the appeal; and if the court finds any legal point arguable on its merits, it must, prior to decision, provide another attorney. Anders v. California, 386 U. S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)."

The question now arises, did petitioner have effective assistance of counsel in the prosecution of his appeal that conforms with the tenets of "due process" of law and within the strictures adopted by our Fourth Circuit in *Nelson*? We think not. The petitioner's assertion that he desired to prosecute an appeal is borne out by his attorney's response to the following questions posed to him at the evidentiary hearing:

"Q. So there was discussion of appeal?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. And you went to trial for the purpose of making a record for appeal?

"A. We went to trial because he wanted an appeal. That's about as easy as I can say it."

From such answers, it appears clear to us that counsel was aware of the fact that in the event that petitioner was found guilty, petitioner, even prior to trial, was desirous of appealing his case. The record reveals that following the conviction of petitioner, counsel failed to follow through with the necessary procedures in order to protect an appeal. For reasons we cannot understand, counsel's inaction came after advising the petitioner to obtain a copy of the transcript, evidently to allow the petitioner to proceed with the protection of his rights as best he could by himself on his own efforts.[3] Under circumstances such as

3. The following questions and answers adequately reveal what transpired between petitioner and counsel following the conviction:

"Q. Did you take any steps to obtain a copy of the transcript for Mr. Sempsrott"

"A. I don't recall who did it, I believe he obtained it. Now when he obtained it, I am not sure.

"Q. Did you obtain it?

"A. Usually, we ask the Court ourselves for a copy of the transcript.

"Q. Did you get a copy of the transcript in this case for your particular records?

"A. To my knowledge, I have never had a transcript.

"Q. Have you ever read it?

"A. Not to my knowledge. I don't recall, Mr. Wood.

"Q. I assume that you did not have a copy of the transcript at the time you advised that no appeal be taken?

"A. That is correct, that is correct.

"Q. Did you ever obtain a copy of the transcript before deciding not to file a notice of appeal?

"A. No, sir, I don't believe; I'm not sure when the transcript was made.

"Q. But you've never seen it?

"A. I believe it went directly to the defendant.

"Q. You don't have a copy in your records?

"A. No, sir, I don't.

"Q. And as court appointed counsel, you are entitled to a copy, are you not?

"A. Yes, sir, that is correct, free of charge."

The Court then asked the following question, to which counsel answered:

"The Court: He (petitioner) has testified here that when he was talking to you about an appeal, that you and Mr. Blankenship told him that you didn't think that he had any grounds for an appeal and that if he insisted on an appeal, that you would ask the Court to

have been revealed here, we can reach no other conclusion but that the principles enunciated in Nelson v. Peyton, supra, have been violated and that, consequently, petitioner's fundamental right to assistance of counsel concerning his right to appeal was not adequately safeguarded.

 Finding as we do that petitioner was deprived of his right to appeal, we do not reach the "due process" question raised by the identification procedures employed in this case. Since the in-court identification is manifestly concerned with the admissibility and inadmissibility of evidence we regard that as a procedural matter better left to state courts. Glasgow v. Moyer, 225 U.S. 420, 32 S.Ct. 753, 56 L.Ed. 1147 (1912); Riddle v. Dyche, 262 U.S. 333, 43 S.Ct. 555, 67 L.Ed. 1009 (1923); Eagles v. United States ex rel. Samuels, 329 U.S. 304, 67 S.Ct. 313, 91 L.Ed. 308 (1946). The allegation raised by petitioner concerning the admissibility of the in-court identification testimony should have been made the subject of review by direct appeal to the state's highest court. Unfortunately, as discussed above, this was not done and the time therefor has long since expired.

However, while we grant the writ, the resulting federal relief is not confined to release from custody. Finding as we do that the only constitutional infirmity in petitioner's imprisonment relates to his right to appellate review under the *holding of Nelson v. Peyton*, supra, we believe that the invocation of the doctrine established by the West Virginia Supreme Court of Appeals in State ex rel. Bradley v. Johnson, 166 S. E.2d 137, 139 (1969), is the best and most practical course for us to follow. Under that doctrine the Common Pleas Court of Cabell County has the power to set aside its original judgment and sentence against petitioner and thereafter resentence him. Such procedure will restore petitioner's right to apply for an appeal and will remedy the previous denial thereof.

In the light of the above observations, it is our conclusion that the writ of habeas corpus should issue, subject to the right of the state of West Virginia to have the petitioner resentenced by the Common Pleas Court of Cabell County, West Virginia, in the manner and as provided by State ex rel. Bradley v. Johnson, supra, after which the petitioner may initiate and prosecute an appeal from his conviction and sentence; provided, however, that if the petitioner after such resentencing shall fail to initiate and prosecute an appeal therefrom within the time provided by law, this Court will entertain a motion by respondent to discharge the writ and dismiss this action.

The Court wishes to express its appreciation to Mr. John F. Wood, Jr., of the Huntington Bar, for his able representation of petitioner, performed without expectation of pay.

relieve you from further representation of him?

"A. That may be correct, Your Honor."