Charles Max JONES

v.

James D. WATKINS, Chief of Naval Personnel, U. S. Navy, in his official capacity, et al.

Paul Pullen SALTER

v.

James D. WATKINS, Chief of Naval Personnel, U. S. Navy, in his official capacity, et al.

Civ. A. Nos. 76–1116, 76–1117.

United States District Court, N. D. Georgia, Atlanta Division.

Sept. 17, 1976.

John William Brent, Robert Joseph Castellani, Brent, Castellani & Palmer, P. C., Atlanta, Ga., for plaintiff.

Sherman D. Johnson, Asst. U. S. Atty., Atlanta, Ga., for defendants.

### ORDER

RICHARD C. FREEMAN, District Judge.

These are actions for federal habeas corpus relief, brought pursuant to 28 U.S.C. § 2241, by two inactive reservists in the United States Navy challenging the fact that they have been called up for active duty in violation of their contractual obligations to the Navy. The actions are presently before the court on (1) respondent's motion to dismiss for lack of jurisdiction, and on (2) petitioners' application for habeas corpus relief. An evidentiary habeas hearing was held by this court on September 1, 1976, and the court makes the following findings of fact and conclusions of law in connection therewith and consistent with this court's summary order entered September 10, 1976.

Before turning to the merits of the action, a brief review of the salient facts is warranted. Both petitioners are general surgeons who recently completed their residency at the Emory University Affiliated Residency Program in Atlanta, Georgia. After graduation from medical school, petitioners, recognizing their vulnerability to military service obligations, sought deferments from military service in order to complete essential residency training through a program known as the "Berry Plan", see 32 C.F.R. § 58. Under this program, a medical doctor receives a commission as a reserve officer and a deferment of active duty which enables the physician to complete his residency training without interruption by the draft or any active duty obligation. Both petitioners were enrolled in and accepted for a Group II Berry Plan deferment, whereby they would be called to active naval service at the completion of their residency training if there was a "need" for their services at that time. Both petitioners received notice that they were being called to active duty in July, 1976, and thereafter sought habeas corpus and injunctive relief from this court. The gravamen of their application for habeas corpus relief is their contention that there is no actual need by the Navy for their services as general surgeons at this time, and that the Navy, therefore, breached its obligations under their Berry Plan contracts. Additionally, petitioners contend that their Berry Plan contract is void *ab initio* since there is no statutory authorization for the Berry Plan or in the alternative that the contract is void for lack of consideration

since the Berry Plan was implicitly tied to portions of the Selective Service System which are no longer in existence. The court will turn first to the question of jurisdiction.

## JURISDICTION

Respondent has moved to dismiss the instant action on two jurisdictional grounds. First, it contends that federal habeas corpus jurisdiction does not lie in this district since petitioners are not in "custody" in this district. Secondly, respondent contends that petitioners' claims are premature and must be dismissed for lack of jurisdiction on account of petitioners' failure to exhaust their administrative remedies by failing to seek relief from the Board of Corrections of Naval Records, pursuant to 10 U.S.C. § 1552 and 32 C.F.R. § 723.

■ The federal habeas corpus statute, 28 U.S.C. § 2241, authorizes federal courts to grant the writ "within their respective jurisdiction." 28 U.S.C. § 2241(a). While the statute speaks in terms of "prisoners", 28 U.S.C. § 2241(c), it is well settled that that term should be liberally construed to encompass members of the armed services who have been unlawfully detained or confined. *Eagles v. United States ex rel. Samuels*, 329 U.S. 304, 312, 67 S.Ct. 313, 91 L.Ed. 308 (1946); *Schlanger v. Seamans*, 401 U.S. 487, 489, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971). Moreover, federal habeas corpus relief extends only to those "in *custody* under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1) (emphasis supplied).

■ In *Schlanger v. Seamans, supra,* the Supreme Court held that the presence of a habeas corpus petitioner's custodian or one in his chain of command within the territorial jurisdiction of the district court was the *sine qua non* of federal habeas corpus jurisdiction. *Id.* at 491, 91 S.Ct. 995. Thus, the authority of a federal district court to grant the writ "within [its] respective jurisdiction" is subject to a two-pronged limitation (1) that the petitioner must himself be located within the territorial jurisdiction of the issuing court and further that (2) the

petitioner's custodian must also be present within the court's territorial jurisdiction. *United States ex rel. Rowland v. Cleary,* 397 F.Supp. 395, 397 (E.D.Wis.1975).

■ In *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972) the Supreme Court clarified the jurisdictional prerequisites that it had set up in *Schlanger,* noting that:

[t]he jurisdictional defect in *Schlanger,* however, was not merely the physical absence of the Commander of Moody AFB from the District of Arizona, but *the total lack of formal contacts between Schlanger and the military in that district.*

*Id.* at 341, 92 S.Ct. at 1695.

Thus, in *Strait v. Laird,* the Supreme Court adopted the reasoning of the Second Circuit in *Arlen v. Laird,* 451 F.2d 684 (2d Cir. 1971), in which that court held that jurisdiction of a habeas corpus action filed by an *unattached* and *inactive reservist* could be predicated upon the petitioner's *contacts* with the military in that district and that such contacts were sufficient to support a finding that petitioner's commanding officer was present in that district. The court, accordingly, rejected the government's contention that the nominal commander of all inactive reservists was not physically present within the jurisdiction, stating:

Quite unlike a commanding officer who is responsible for the day to day control of his subordinates, the commanding officer of the Center is the head of a basically administrative organization that merely keeps records of unattached reservists. To give the commanding officer of the Center "custody" of the thousands of the reservists throughout the United States and to hold at the same time that the commanding officer is present for *habeas corpus* purposes only within one small geographical area is to ignore reality.

*Id.* at 687. *See also, Eisel v. Secretary of the Army,* 155 U.S.App.D.C. 366, 477 F.2d 1251, 1256–57 (1973); *Donigan v. Laird,* 308 F.Supp. 449, 453 (D.D.C.1969). In sum, at least with respect to inactive and unattached reservists, territorial jurisdiction

may be grounded upon a finding that the commanding officer is present in the district because of a petitioner's formal and significant contacts with the military in the district in which habeas corpus relief has been sought.

Respondent contends, however, that in contrast to the factual situation in *Strait,* the petitioners herein have shown only casual and insignificant contacts with the military in this district, and that the only meaningful contacts that petitioners have had with the military were with the Bureau of Medicine and Surgery of the Department of the Navy in Washington, D. C. [hereinafter the "Bureau"]. Before turning to the merits of this argument, a brief review of the jurisdictional facts is warranted.

Petitioner Salter is a native of Alabama, attended and graduated from College in Virginia, and graduated from the Medical School of the University of Alabama in 1971. Thereafter, Salter did his internship and residency in Atlanta, Georgia. In 1971, petitioner Salter processed his application to be enrolled in the Berry Plan through a Navy recruiting office in Macon, Georgia, and was commissioned as a naval reserve officer in Georgia, with the attendant oath of that office being administered to him in Atlanta, Georgia. Since that time his contact with the Navy has been in the form of correspondence between petitioner and the Bureau in Washington, D. C., including his most recent attempts to procure an administrative discharge from the Navy which were directed to the Bureau. Petitioner's orders to report to active duty were sent to him at his home in Atlanta, Georgia, although it is now evident that since the time of instituting this action petitioner has returned to Alabama to engage in the practice of general surgery with his father.

Petitioner Jones attended and graduated from college in North Carolina and medical school in New York. Since July, 1971, he has resided in Atlanta, while completing his internship and residency. His application for enrollment in the Berry Plan was processed through the recruiting office in Macon, Georgia, and he was commissioned in Georgia. Petitioner Jones' orders to report to active duty were sent to him in Atlanta, and his formal contacts with the military have been limited to a stream of correspondence with the Bureau in Washington, D. C., including his application for administrative discharge. He is currently engaged in the practice of general surgery in this district.

At the outset, this court notes that petitioners' formal contacts with the military in the State of Georgia are somewhat tangential when compared to those the Supreme Court found determinative of the jurisdictional question in *Strait.* Thus, in *Strait,* the Supreme Court noted that Strait was a reserve officer who had never been on active duty, that California was his "home" and that he received his commission in California. Moreover, the court noted that petitioner applied for his release from his military obligations as a conscientious objector at a military installation in California, but that, as with all other inactive reservists, his records and his nominal commanding officer were located at the Reserve Officer Components Personnel Center at Fort Benjamin Harrison, Indiana. The court concluded:

> Strait's commanding officer is *"present"* in California *through the officers in the hierarchy of the command who processed this serviceman's application for discharge.* To require him to go to Indiana where he never has been or assigned would entail needless expense and inconvenience. It "would result in a concentration of similar cases in the district in which the Reserve Officer Components Personnel Center is located." *Donigan v. Laird* [supra, 308 F.Supp. at 453]. The concepts of "custody" and "custodian" are sufficiently broad to allow us to say that the commanding officer in Indiana, operating through officers in California in processing petitioner's claim, is in California for the limited purposes of habeas corpus jurisdiction.

*Id.* 406 U.S. at 345–46, 92 S.Ct. at 1695–96.

Arguably, on the basis of *Strait,* petitioners' most meaningful and significant con-

tacts with the Navy have been with the Bureau in Washington, D. C., since there is no dispute as to the fact that petitioners' applications for discharge have been processed directly through the Bureau rather than through any one in the chain of command in Georgia. Thus, respondent's contention that either the Bureau or the nominal defendant, the Chief of Naval Personnel, is not present in this district for the purposes of exercising this court's habeas corpus jurisdiction is not wholly without merit. However, the recent decision by the Court of Appeals for the District of Columbia Circuit, *Eisel v. Secretary of the Army*, 155 U.S.App.D.C. 366, 477 F.2d 1251 (1973), makes it equally clear that district court in the District of Columbia would refuse to entertain petitioners' applications for habeas corpus relief in that district. Thus, in *Eisel*, that court, after noting the fact that inactive reservists may have contacts with the military in numerous different places, held that a petitioner's "home or *domicile*" should be the determining factor in deciding the proper forum for these sort of habeas corpus actions. *Id.* at 1263. On the facts in *Eisel*, that court concluded that an inactive reservist whose most significant contact with the military was in Massachusetts, but whose "immediate custodian" was officially located in the District of Columbia, was required to bring suit in New York, the state of his domicile. *Accord, Lantz v. Seamans*, 504 F.2d 423 (2d Cir. 1974). While this court declines to adopt the domicile rule posited in *Eisel*, that decision makes it abundantly clear that petitioners herein might have no forum in which to present their habeas claims were this court not to exercise jurisdiction. Thus, it is evident, at least with respect to petitioner Salter, that although he arguably is domiciled in Alabama, he has never had any significant contacts with the military in that state and that under the traditional *Strait* "contacts" approach, it is extremely doubtful that a district court in Alabama would exercise jurisdiction. Moreover, while the Court in *Strait* found it significant that petitioner's application for a conscientious objector discharge was processed

through officers in California and that hearings were held in that state, the court made it equally clear that the situs where an inactive reservist's records were fortuitously kept, or the location of a reservist's nominal commanding officer, was a particularly inappropriate choice of forum.

In the instant case, the mere fact that petitioners are in a very specialized branch of the military whose claims could only be processed through the Bureau in Washington, D. C., should not prevent this court from exercising its jurisdiction, when it is evident that all their significant contacts with the military have occurred while they were present in Georgia. In sum, applying the relevant principles to the facts herein we are constrained to conclude that petitioners have established the requisite contacts with the military in this district, including the fact that they enrolled in the Berry Plan in Georgia, through recruiting efforts by the military in Georgia, were commissioned in Georgia, were ordered to active duty in Georgia, and were present in Georgia at all times in which they pursued their administrative discharge. Accordingly, we hold that petitioners' custodian, the Chief of Naval Personnel, was present in this district for the very limited purpose of habeas corpus jurisdiction over the claims of these inactive reservists.

## EXHAUSTION

Respondent has also moved to dismiss the instant action on the grounds that the court lacks jurisdiction on account of petitioners' failure to exhaust their administrative remedies before the Board for Correction of Naval Records [hereinafter "Board" or "BCNR"]. *See* 10 U.S.C. § 1552, 32 C.F.R. § 723. It is well settled in this circuit that:

a court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures.

*Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir. 1971); *Hodges v. Callaway,* 499 F.2d 417, 419–20 (5th Cir. 1974); *McCurdy v. Zuckert,* 359 F.2d 491 (5th Cir. 1966), *cert. denied,* 385 U.S. 903, 87 S.Ct. 212, 17 L.Ed.2d 133.

The Board for Correction of Naval Records, established pursuant to 10 U.S.C. § 1552(a), is authorized by statute to "correct any military record . . . to correct an error or remove an injustice." 10 U.S.C. § 1552(a). Petitioners, however, have alleged that they have had insufficient time in which to prosecute such an appeal and that they will suffer irreparable injury by immediate induction into the military service if they are denied judicial review at this time.

There has been considerable disagreement among the circuits as to whether the administrative review afforded by the BCNR or other similar boards established for the other branches of the armed forces is required. In *Ogden v. Zuckert,* 111 U.S. App.D.C. 398, 298 F.2d 312 (1961), the seminal decision in this area, the Court of Appeals held that while review under 10 U.S.C. § 1552(a) was available, it was not required, and that failure to pursue this remedy did not deprive a federal court of its jurisdiction; however, it further held that a court did have discretion in refusing to hear the suit. In reaching that decision, the court reasoned that the obvious purpose of the act was to allow the Board to correct military records without the necessity of enacting private bills in Congress, and that Congress did not intend to affect judicial jurisdiction thereby. The *Ogden* holding was limited, however, in *Sohm v. Fowler,*

124 U.S.App.D.C. 382, 365 F.2d 915 (1966), which held that once a petition was filed with the Board to correct the record, the court would not exercise jurisdiction until the administrative review process had been completed. *See also, McCurdy v. Zuckert, supra* (dismissal of action required). As a general rule, exhaustion of remedies before the Board has been required in cases involving *post*-discharge applications for corrective relief. *See Nelson v. Miller,* 373 F.2d 474, 479 (3d Cir. 1967), *cert. denied,* 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980; *McCurdy v. Zuckert, supra.*[1] On the other hand, several courts have held that exhaustion before the Board is not required when a *discharge* from the Army is sought. *See Williams v. Froehlke,* 356 F.Supp. 591 (S.D.N.Y.1973); *United States ex rel. Joy v. Resor,* 342 F.Supp. 70 (D.Vt.1972); *Hayes v. Secretary of Defense,* 169 U.S.App.D.C. 209, 515 F.2d 668 (1975). Likewise, in an analogous line of cases several of the circuits have held that an unsuccessful applicant for *post*-induction conscientious objector discharge need not appeal to the Board in order to exhaust his administrative remedies. *See, e. g., Pitcher v. Laird,* 421 F.2d 1272 (5th Cir. 1970);[2] *United States ex rel. Brooks v. Clifford,* 409 F.2d 700, 706–07 (4th Cir. 1969); *Hammond v. Lenfest,* 398 F.2d 705, 713 (2d Cir. 1968).

■ *Seepe v. Department of the Navy,* 518 F.2d 760 (6th Cir. 1975), relied upon by respondent, is not to the contrary, for that decision implicitly recognized that where there was an emergency, hardship, or where the administrative appeal was futile, a court would not require exhaustion of intraservice administrative remedies before entertaining a habeas corpus action.[3] In

---

1. *McCurdy v. Zuckert, supra,* involved a general discharge for unfitness by a Board of Officers. The district court although recognizing the exhaustion requirement denied McCurdy's request for temporary injunctive relief; however, it retained jurisdiction pending petitioners' seeking review from the Air Force Board for Correction of Military Records. The Fifth Circuit held, however, that the action should be dismissed since it was evident that the court lacked jurisdiction and that McCurdy could have a full evidentiary hearing on his discharge. Moreover, it was clear that post-dis-

charge review was capable of granting petitioner full retroactive restoration.

2. *Pitcher v. Laird, supra,* and the cases cited therein do not require exhaustion, provided there were neither court-martial nor military justice procedures pending. *Compare United States ex rel. Berry v. Commanding General,* 411 F.2d 822 (5th Cir. 1969).

3. The traditional exceptions to the exhaustion requirement have been set forth by this circuit in *Hodges v. Callaway, supra,* where it was

*Seepe*, however, the court found that there were no special circumstances warranting relief from failure to exhaust, because petitioner waited three years after he learned of the alleged misrepresentations in his enlistment contract before invoking administrative remedies. *Id.*, 518 F.2d at 765. In contrast, in the instant case petitioners could not have been aware that the Navy had determined that there was a "need" for their services until they received their notices dated March 22, 1976, that they were being called to active duty. Moreover, in view of the delays that have already been experienced by petitioners with respect to their applications for discharge,[4] it is evident that petitioners would be subject to irreparable injury and hardship in having to report for induction pending administrative review, and that habeas corpus relief affords a much speedier and more effective remedy. *See United States ex rel. Brooks v. Clifford, supra,* 412 F.2d at 675. *See* note 4, *supra.*

## MERITS

Petitioners have offered several novel theories in support of their contention that their obligations to the Navy are non-existent or that the Navy has breached its obligations under the contract *sub judice.* In the first instance, petitioners contend that their contracts are *void ab initio* since respondent was without Congressional authorization either to establish the Berry Plan or to enter into any contract pursuant to the Plan.

█ Petitioners' contentions in this respect are without merit. Article I, Section 8, Clause 13 of the United States Constitution authorizes the Congress to "provide and maintain a Navy"; pursuant to that authority, Congress has delegated to the Executive the power to promulgate regulations necessary to accomplish the statutory powers relating to the armed forces. *See* 10 U.S.C. § 280. In a similar vein, the heads of executive departments or military departments may prescribe regulations for the government of the department and the conduct of its business. *See* 5 U.S.C. § 301. These statutory delegations further encompass the establishment of reserve components, including the United States Naval Reserve, *see* 10 U.S.C. § 261, the statutory purpose of which is "to provide trained units and qualified persons available for active duty in the armed forces" during periods of war or national emergency and at other times that the national security requires. 10 U.S.C. § 262. Congress has further delegated to the executive the power to prescribe regulations necessary to carry out the explicit purpose of the reserve components. *See* 10 U.S.C. § 280. Moreover, general authority to order members of reserve components in medical, dental, or

recognized that "only those remedies which provide a *real opportunity for adequate relief* need be exhausted;" 499 F.2d at 420.

4. Significantly, each petitioner, immediately upon learning that he was being called to active duty sought discharge from the Navy Medical Corps in April or May. Petitioner Jones received correspondence from D. L. Custis, Vice Admiral, MC, United States Navy, Surgeon General on April 30, 1976, denying him the right to be released of his obligation but referring it to the Bureau of Naval Personnel so that it could be given "maximum consideration." No further concrete response has emanated from the Bureau of Naval Personnel in the preceding four months. Likewise, petitioner Salter received a reply indicating that his discharge would be denied on June 9, 1976, but that the matter had been referred to the Chief of Naval Personnel for his consideration. Nevertheless, no response has ever been received from the latter office. In view of the delays already experienced by these petitioners, we think the dicta of *United States ex rel. Brooks v. Clifford* is somewhat apposite:

we could retain jurisdiction and stay all proceedings pending his application now to the Army Board. Conceivably, such an application could result in the granting of his request. But for this petitioner, judicial efficiency would not be thereby promoted; *we have already decided the merits of his case. Id.*, 412 F.2d at 1140. (emphasis supplied). Unlike the court cited above, *McCurdy v. Zuckert* requires this court to dismiss the action pending exhaustion unless the court finds one of the exceptions to the exhaustion requirement applicable. Thus, we are forced to conclude that the Navy's delay in issuing a final denial is tantamount to a denial and moreover, excused petitioners' from their failure to exhaust futile remedies.

allied specialties who have not already served at least one year of active duty and who are under 35 years of age to active duty for not more than two years is vested in the President by 50 U.S.C.App. § 454(*l*)(1), and such power has been delegated to the Secretary of Defense in Executive Order No. 10762, 23 Fed.Reg. 2119, March 28, 1958. That authority was redelegated to the secretaries of the individual military departments. *See* 32 C.F.R. § 76.6. Pursuant to the above-mentioned provisions, the Department of Defense and the Selective Service System promulgated the Berry Plan [Armed Forces Physicians' Appointment and Residency Consideration Program] to ensure the availability of physician specialists for military service. In sum, the constitutional, statutory, and administrative pattern establishes broad authority to adopt the Berry Plan as well as any other rules consistent with these delegated powers, and petitioners' contracts are not, therefore, *void ab initio. Cf. Appelwick v. Hoffman et al.*, 540 F.2d 404 (8th Cir. 1976) (implicit authority in Army to establish substantive regulatory guidelines for hardship or essentiality exceptions to active duty requirements).

■ Petitioners also rely upon the so-called "continuing contract" theory, contending that respondent failed to perform its contractual duties under the contracts and/or that it was prevented from performing such duties when Congress failed to extend the Selective Service Act of 1967 in 1973, thereby rendering inductions into the armed services pursuant to the Berry Plan or otherwise impermissible. Petitioners both signed "Navy Residency Deferment Agreements" pursuant to which they would be *"deferred* for *one* year at a time with automatic consideration given each year for extension of my deferment." (emphasis supplied). At the outset, petitioners note that there is some confusion as to whether the Navy or the Selective Service System authorized such deferments, further noting that only the Selective Service System is authorized to give deferments. However, the gravamen of their contentions in this respect have been summarized as follows:

[after] July 1, 1973, Petitioners could not be given any deferments by the Selective Service System and the Navy was incapable of administering Berry Plan Group II deferments in General Surgery under the rules of the Berry Plan. Continuance of the Berry Plan and *yearly deferments* were integral parts of the contracts between Petitioners and Respondents; in fact, it is suggested that this continuing obligation of the government to bestow deferred status upon the Petitioners was the sine qua non of the entire contractual agreement between the parties. Had the Petitioners not been under the authority of the Selective Service System at the time the contract was entered into, the Navy would have had nothing to offer to induce their respective promises of future performance. The basis of the contracts was the exchange of promised performances, i. e., Petitioners' promises of future service for Respondents' promises of yearly renewal deferments from induction while Petitioners qualified for residency training.

Petitioners' contentions, while beguiling, do not accurately reflect the present status of pre-existing military obligations which antedated the Congressional failure to renew the Selective Service Act of 1967. The termination of the draft and other induction procedures did not automatically excuse petitioners from their prior military obligations, for 50 U.S.C.App. § 467(c) expressly provides that

Notwithstanding any other provision of this title [sections 451, 453, 454, 455, 456 and 458–471 of this Appendix], no person shall be inducted for training and service in the Armed Forces after July 1, 1973, *except persons now or hereafter deferred under section 6 of this title* [section 456 of this Appendix] *after the basis for such deferment ceases to exist.* (emphasis supplied)

The Act, therefore, contains an exception which specifically authorizes the induction of persons after July 1, 1973, including those persons who had been granted defer-

ments, pursuant to 50 U.S.C.App. § 456, which includes

> Any person, other than a person referred to in subsection (d) [inapplicable herein] of this section, who—
>
> (i) prior to the issuance of orders for him to report for induction . . . enlists or accepts appointment, before attaining the age of 26 years, in the Ready Reserve of any Reserve Component of the Armed Forces, . . . shall be deferred from training and service under this title so long as he serves satisfactorily as a member of an organized unit of such Reserve, . . . or satisfactorily perform such other Ready Reserve service as may be prescribed by the Secretary of Defense.

50 U.S.C. § 456(c)(2)(A).

Thus, § 467(c), when read in conjunction with § 456(c)(2)(A)(i), makes it clear that the military retained the authority to induct those persons who had received deferments prior to July 1, 1973. *See United States v. Dolinger,* 384 F.Supp. 682 (S.D. N.Y.1974).[5] As a consequence, Congress' failure to extend the draft and induction under the Selective Service Act did not affect petitioners' status as commissioned officers in the Naval Reserve who were subject to being called for active duty when the basis "for such deferment ceases to exist", that is, upon completion of their residency training. Likewise, the shift to an all-volunteer Navy did not affect the authority of the President or his delegate to order members of the reserve components in medical, dental, or allied specialties to active duty, pursuant to 50 U.S.C.App. § 454(*1*). *See Appelwick v. Hoffman, supra* (failing to enjoin army from calling Berry Plan physician to active duty, without discussion of any lack of authority to induct physicians on account of demise of selective service system).

The understanding and agreement between the parties herein, as evidenced by the express terms of the contract of deferment, was that as long as petitioners continued toward satisfactory completion of their residency programs, their deferment from active duty status would likewise be continued. Each year, the Navy submitted inquiries to petitioners' residency program and on the basis of those responses, an annual determination was made as to whether their deferments would be renewed. Because petitioners' commitments and obligations to the service were not in any way affected by the failure to extend the selective service laws, it is evident that petitioners could have been called to active duty at any time they were no longer engaged in the residency program in general surgery, or their performance had been unsatisfactory, or in other words, when the basis for their deferment ceased to exist. In conclusion, the contract does not fail for lack of consideration, since petitioners received the benefit of their bargain, in the sense that they received annual deferments while completing their residency training uninterrupted by military obligations in exchange for their promise that they would be called to active duty upon completion of their residency training. In conclusion, then, petitioners' contracts with the Navy are neither *void ab initio* nor unenforceable for lack of consideration. Thus, the sole question remaining for this court is whether, assuming the validity of the contract *sub judice*, the Navy, as a matter of fact, breached the contract by calling petitioners to active duty when there was no need for their services as general surgeons.

It is well settled that the commissions signed by petitioners create valid and enforceable contracts between them and the Navy. *United States v. Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *Even v. Clifford,* 287 F.Supp. 334 (S.D.Cal.1968); *Myers v. Parkinson,* 398 F.Supp. 727 (E.D.Wis.1975). Moreover, claims that enlistment contracts have been

---

**5.** In *United States v. Dollinger, supra,* the court held that when the Draft Board's authority to induct persons under the 1967 Act was terminated on July 1, 1971, the Board still had authority to induct persons previously deferred whether or not that deferment was terminated either before or after July 1, 1971. *Accord, United States v. Case,* 344 F.Supp. 169 (W.D. Mo.1972).

breached are decided under traditional notions of contract law. *Shelton v. Brunson*, 465 F.2d 144 (5th Cir. 1972); *Peavy v. Warner*, 493 F.2d 748 (5th Cir. 1974); *United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77 (S.D.N.Y.1975).

At the evidentiary hearing held before this court, Dr. (Capt.) John Carr, Deputy Director of the Navy Medical Corps, testified as to the history of the Berry Plan and his personal responsibilities in assigning all physicians in the Navy and the Marine Corps. After World War II, the armed services, recognizing their need to assure that their requirements for physicians with specialized training should be planned and met adopted the so-called Berry Plan. The Berry Plan was available to all physicians who graduated from medical school on a competitive basis and participation therein was voluntary. The Berry Plan offered benefits to both the Navy and to the individual participants, in the sense that the Navy was able to make longer-ranged planning for the availability of specialists and also received a better trained and higher quality of physicians. On the other hand, the participants were allowed to complete their residencies uninterrupted by existing military obligations, and participants had the privilege of entering the armed forces as commissioned officers, rather than risk involuntary induction through the draft as an ordinary private or seaman recruit.

Several alternative methods of deferment and induction were available. Reserve officers in Group I of the Plan agreed to be called to active duty immediately upon completing their residency training. On the other hand, officers in Group II, such as petitioners, might or might not be called to active duty upon completion of their specialty training depending upon the requirements of the sponsoring service at that time. The gravamen of the petitions *sub judice* is not only that there is no generalized need on the part of the Navy for their services, but also that the Navy does not require their services at the particular duty stations to which they have been assigned, Key West, Florida, and on board the U.S.S. Constellation.

■ At the outset, we reject petitioners' contention that a localized standard for determining "need" should be adopted. In the first instance, since we are governed by general principles of contract construction, it cannot be reasonably contended that petitioners' commitment to active duty service was conditioned upon assignment or non-assignment to these particular duty stations; that is, in the converse situation, if there were a glut of qualified general surgeons in the Navy, this court would not be inclined to order petitioners to report to Key West or the Constellation simply because of the Navy's failure to assign qualified personnel to such locations. In any event, since there is no guarantee that petitioners might not be transferred in accordance with the shifting requirements of the Navy, we adopt a rule that it is incumbent upon the respondent to show only an overall need for the services on the part of the Navy for general surgeons, as a precondition to calling them to active duty.

■ Dr. Carr testified that there are currently 3600 billets or Congressionally authorized positions for physicians in the Navy Medical Corps and that there is an overall shortage of 200 doctors; with respect to general surgeons, there are 170 authorized positions and the Navy is currently 14 short. Moreover, Dr. Carr stated that the volunteer service is simply not working for the medical branch since "recruitment of doctors is dismal in both quality and quantity." Previously, the Navy's medical requirements were met, in a significant part, by Berry Planners, for in 1970, 740 Berry Planners were programmed to enter the military, while in 1980 only 2 physicians are scheduled to enter military service. In 1976, 235 Berry Planners were called to active duty, and that figure includes all the doctors in both Groups I and II.

The Navy is required to provide medical and dental care to all active members of the Navy and Marine Corps, or approximately 740,000 active duty personnel. *See* 10

U.S.C. § 1074(a). Moreover, dependents of active duty personnel, retired personnel, and their dependents may receive medical care and dental care in a military facility to the extent that space and capability exists. *See* 10 U.S.C. § 1074(b) and 10 U.S.C. § 1076(a). The dependents of active duty military personnel and retired personnel together with their dependents comprise approximately an additional 1,243,000 people, who *may* receive medical care.

Captain Feith, Director of Manpower Management and Requirements of the Navy Medical Corps, testified that the Navy Medical Corps has two major forms of medical treatment responsibility: (1) institutional and (2) non-institutional. Thus, the Navy must provide medical services at its institutionalized system of hospitals and clinics, including, for example, Bethesda Naval Hospital and San Diego Naval Hospital, as well as to non-institutionalized areas and remote areas such as Antarctica and overseas naval installations where its active duty naval personnel are located. Captain Feith further stated that as a rule of thumb an adequate physician/patient ratio is 1 physician per 1,000 population, and a ratio of approximately 2.4 surgeons per 10,000 population, based on studies done on surgical services in the United States [hereinafter SOSSUS figures]. Using the SOSSUS figures as a guideline, Capt. Feith testified that an appropriate number of surgeons required to care for the active duty personnel alone would be approximately 177.6 general surgeons, while only 170 are authorized by Congress, and only 156 authorized positions are currently filled. Dr. W. D. Warren, Chairman of the Department of Surgery at Emory University, an expert witness called by petitioners, however, testified that exclusive of times of war or hostilities, active duty members of the military would require significantly fewer medical services than the population as a whole, since they are both younger in age and have gone through significant screening processes including physicals before being inducted into the armed forces. While this court does not discount the accuracy of Dr. Warren's testimony, it fails to take into account two significant factors. In the first instance, while active duty members of the armed forces may be of generally better health than the population as a whole, they are, nevertheless, engaged in a significant number of "industrialized" activities on board ship involving heavy machinery. Similarly, the 156 general surgeons currently serving the Navy include those who might be assigned to remote areas or outposts and serve a population of only a few hundred military personnel and dependents but are necessary because of the dearth of any other form of medical care. As a consequence, the actual surgeon/patient ratio in areas with a greater complement of military personnel may in all probability be diluted far below the SOSSUS figures. Finally, unlike the civilian community, the Navy has an express responsibility not only to supply medical services to the military in peacetime, but also to assure that there are contingency plans for the armed forces to have qualified physician personnel available in the event of a national emergency. Accordingly, this court concludes that in view of these factors which are peculiar to the military, a surgeon/patient ratio of approximately 1/4,350 active duty personnel and 1/11,000 for all personnel and dependents is neither unreasonable nor unnecessary and that the respondent has established a need for the services of general surgeons, including petitioners herein.

This court concludes that petitioners' applications for habeas corpus relief are without merit and therefore DENIED. This action is hereby ORDERED to be DISMISSED.

In sum, the court has today (1) DENIED respondent's motion to dismiss for lack of jurisdiction and (2) DENIED petitioners' applications for habeas corpus and/or injunctive relief.

IT IS SO ORDERED.